## HENRIETTA B. RESNIK
*vs.*
## THOMAS H. RUSSELL, ET AL.

Superior Court New Haven County File No. 52082

MEMORANDUM FILED OCTOBER 30, 1939.

*Franklin Coeller*, of New Haven, for the Plaintiff.

*Day, Berry & Howard*, of Hartford, for the Defendants.

QUINLAN, J. Notwithstanding that the length of this trial built up a record which counsel desired the use of in the preparation of their briefs, and hence brought about a delay until September before their filing, the narrative will be confined within such limits as seems essential to its disposition.

Prior to October 12, 1936, the plaintiff had suffered from vaginal hemorrhages. Upon consultation with one Thomas L. Gingold, a specialist in gynecology and obstetrics, she was admitted to Grace Hospital and an operation, in the way of a dilatation and curettage of the uterus to produce an artificial menopause, was performed. Dr. Thomas L. Russell, an owner of and an expert in the use of radium, was brought into the picture by Dr. Gingold. Radium can prove to be a highly dangerous instrumentality because of its disposition to burn. Dr. Gingold and Dr. Russell were in charge of the operation, and although Dr. Russell indicates that he was the mere lessor of the radium, his charge included professional service. Moreover, it was agreed among the doctors that Dr. Russell should remove the radium after 36 hours use.

The radium container is about the size and shape of a cigarette and was inserted through the vagina into the uterus. I do not find that the uterus was packed, but I do find that sufficient gauze to keep the radium in place was inserted in the uterus and then the vagina was packed tightly with gauze.

At the expiration of the aforesaid 36-hour period Dr. Russell was suffering from a cold and because of the danger of infection that might be caused to the patient, should he execute his plan to remove the radium, he called Dr. Berlowe, an attending physician (who had not been admitted to practice) and told him to remove the radium. Dr. Berlowe had previously removed radium in the wards of the hospital. He removed the radium in this case but did not remove any of the packing. The defendants seemed to contend in their brief that ordinarily the packing comes out with the removal of the radium. Apparently this contention is an attempted adaptation of a method *not used* by the doctors here, but recommended by Dr. Musselman, whereby the packing is attached to the radium, and by pulling the string the packing and radium will be removed. The chart recorded "*radium* removed by Dr. Berlowe at 9:45 p.m."

Neither Doctors Russell nor Gingold made any examination of the patient subsequent to the operation and prior to her removal from the hospital. A Dr. Etkind, a nephew of the plaintiff, had no surgical responsibility in this case, and his contacts with the plaintiff, probably prompted by good ethics, was more of an advisory and social nature than otherwise.

The fact is the packing remained in the plaintiff for a period of six weeks. No blame attaches to the plaintiff on this account, as she had been advised that radium's reaction was different on various people and six weeks was required in obtaining this reaction. She modestly and courageously went through the full period. I do not attach any negligence to Dr. Etkind in this connection either, because he was neither an expert in radium or gynecology, and was not the attending surgeon.

Even recognizing the rule of law which requires a physician or surgeon to exercise ordinary skill and care toward his patient, that is, that degree of care and skill ordinarily had and exercised by physicians and surgeons engaged in the same line of practice (*Slimak vs. Foster*, 106 Conn. 366), there was a violation of that duty. It probably is true that Dr. Russell was justified in directing some one in whom he had confidence to remove the radium, but after doing so he should have assured himself by an examination because, among other things, the chart showed that only the radium was removed, and against his positive directions there was no packing preserved, because none had been removed. Dr. Gingold was the acting surgeon in the case and saw plaintiff on the day of her dismissal. The charts of the plaintiff's case contained ample to put him on notice that danger was lurking, but the fact remains that after the operation neither Dr. Russell, the only one of the doctors who knew anything about radium, nor Dr. Gingold, who was the operating surgeon and gynecologist expert in the case, made an examination of the patient after the operation was executed. It is unfortunate that Dr. Russell had a cold and he may have thought he was doing all that was necessary, but his duty required that he know that the patient was protected from a substance like radium and any apparatus connected therewith, and this could have and should have been checked by examination.

So far as damages are concerned I shall first discuss the resulting condition of arthritis which in its exacerbated state

is attributed by the plaintiff to the presence of the packing for so long a time, in the vagina, that toxins permeated the walls of the body and entered the blood stream. It must be remembered, however, that arthritis is not too well understood by the medical profession. Any systemic change may bring it about and here the operation itself was intended to induce an artificial menopause. It is a well known fact that a natural menopause has been related by the profession to arthritis, so much so that some of the profession speak of menopausal arthritis. This being so, I cannot find sufficient justification in the proof to make it reasonably probable that the presence of the packing lit up a dormant arthritis. When it comes to other manifestations appearing in the patient during the six-week period, I am thoroughly convinced that they were experienced. The plaintiff is a modest sensitive woman and did not overstate her experiences of that six-week period. A mere outline of them will suffice to picture her pains, inconvenience and suffering. The latter was physical and mental. Her mental suffering was no mere psychosis but real and terrorizing.

During the six weeks preceding the removal of the packing, the plaintiff suffered agonizing terror, pain and inconvenience; was compelled to arise many times in the night because of pressure on the bladder and similar frequency, of course, occurred during the daytime. A foul, greenish discharge, accompanied by a sickening odor, caused fear to the plaintiff that some inward part was rotting, with the incident horror of malignancy; there was great pain on voiding and inability to expel intestinal contents, with pain in the rectum. In her endeavors toward cleanliness there was frequent changing of pads and frequent douches. Upon the removal of the packing she was greatly affected by the nauseating odor and the presence of blood. Vaginal pads were required to be changed every two hours or more frequently, and all of the foregoing was accompanied by almost complete loss of sleep which was not compensated for in the daytime because of the condition she was experiencing. There was also loss of appetite and a depletion of strength and nerve reserve. She suffered cold sweats, chilly sensations and pain in the occipital and frontal regions.

To suffer the foregoing, occasioned by reliance upon surgeons and their advice that the radium results could not be determined for six weeks, plainly entitles this woman to damages for that pain and suffering, which is not of the ordinary

sort. The fact that during this time her special damage was nothing, or at least negligible, does not measure the sum that she is entitled to.

Judgment may be entered against the defendants Russell and Gingold for Four Thousand ($4,000) Dollars damages and costs, and for the defendant Etkind.